STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1217

STATE OF LOUISIANA

VERSUS

TERRANCE L. SINEGAL

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 122785.2
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Michael Harson**
**District Attorney, Fifteenth Judicial District Court**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Terrance L. Sinegal**

**GREMILLION, Judge.**

Defendant, Terrance L. Sinegal, and three co-defendants, Dryefus Malbrough, Lorenzo Angelle, and Courtney Romero, robbed Nicholas Carter of $289.00. Defendant was charged by bill of information with armed robbery, a violation of La.R.S. 14:64. Defendant was found guilty of a responsive verdict, simple robbery. He was sentenced to serve seven years at hard labor, with credit for time served. Defendant is now before this court on appeal, challenging both his conviction and sentence in six assignments of error.

### ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues that the evidence introduced at trial was insufficient to prove his identity as a participant/principal in the robbery beyond a reasonable doubt. Defendant maintains that the victim testified repeatedly that Defendant was too small to have been one of the masked robbers.

The analysis for a claim of insufficient evidence is well-settled:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

Defendant was convicted of simple robbery, defined in La.R.S. 14:65(A) as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not

armed with a dangerous weapon." Defendant does not contest that a robbery took place on the evening of December 15, 2008, but maintains that he was neither a participant in, nor a principal to, the robbery.

In support of his assertion, Defendant refers to *State v. Bright*, 98-398, p. 22-23 (La. 4/11/00), 776 So.2d 1134, 1147[1], wherein the court discussed the issue of identity as follows:

> When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. *State v. Smith*, 430 So.2d [31] at 45 [La.1983]; *see also State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). However, we are mindful that the touchstone of *Jackson v. Virginia* [, 443 U.S. 307, 99 S.Ct. 2781 (1979)] is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d [1305] at 1310 [La.1988].

At trial, Defendant was identified by co-defendants Courtney Romero and Lorenzo Angelle as one of the two masked robbers. Romero and Angelle both testified about the events at issue, including the plan to rob and eventual robbery of the victim. Romero stated that she was at Angelle's house when Angelle received a phone call from Dryefus Malbrough. Romero was fifteen years old at that time and was living with Angelle. Malbrough indicated that he wanted to "hit a lick," or rob someone. Soon thereafter, Romero and Angelle met up with Malbrough and a man to whom she was introduced as "Trill;" she did not know his real name. Romero identified Defendant in open court as "Trill." Romero then called the victim and arranged to meet him at her cousin's house to purchase Ecstasy pills for

---

[1]The *Bright* conviction was eventually reversed because of certain exculpatory information that was withheld from the defense. *State v. Bright,* 02-2793, 03-2796 (La. 5/25/04), 875 So.2d 37.

her cousin. Romero led the victim to believe that after taking the pills inside to her cousin, she would leave with the victim.

Angelle drove Romero to the location. Angelle drove a black Oldsmobile Cutlass, and Malbrough drove a white Chevrolet Malibu. Defendant was in the passenger seat of Malbrough's car. To get the pills and money from the victim, Romero believed that the three men planned to strong-arm the victim. Romero called the victim to ascertain his whereabouts, and he indicated that he was about to arrive. The three men went to the back of the house. When the victim arrived, Romero walked to his vehicle, opened the door, put her cigarettes and belongings on his seat, and asked him if he had the pills. The victim then got out of the vehicle and reached under his seat. Romero removed the keys from the ignition and ran under the carport. She told the three men that she had the keys, and they ran up to the vehicle. Malbrough and Defendant ran up to the driver's door wearing black hoodies and bandanas around their faces. When the victim saw them, he jumped back into the vehicle. Malbrough and Defendant shoved their guns in the victim's face and ordered him to give them the money and pills. Meanwhile, Angelle entered the vehicle on the passenger side and went through the victim's console to see what he could find. According to Romero, the victim started throwing money. Romero returned the keys, and the victim drove away after the men instructed him to leave.

Afterward, Romero and Angelle went to the home of Mennifer Sinegal, Malbrough's girlfriend, where they met back up with Malbrough and Defendant to split the money. Of the $289.00 stolen, Angelle received $89.00, and Malbrough and Defendant each received $100.00. Romero and Angelle then went to Angelle's house and went to bed without changing clothes.

3

About thirty to forty-five minutes later, the police arrived at Angelle's house. At first, Romero denied having any knowledge of the offense. After the police brought Romero to the station and contacted her mother, Romero gave a written statement. Romero was prosecuted through the juvenile department for her involvement in the offense. She admitted to the charge, principal to armed robbery, served three months in juvenile detention, and was placed in drug court, where she was in treatment for nine months. Romero stated that she successfully completed the program and was clean at trial.

On cross-examination, Romero testified that she was eleven years old when she started using drugs. The victim began supplying her with drugs, including Ecstasy, cocaine, and marijuana, when she was twelve to thirteen years old. Romero's boyfriend at the time paid for the drugs. Prior to her relationship with Angelle, she had a sexual relationship with the victim. She used her prior relationship with the victim to lure him to the location of the robbery, with the understanding that she would leave with him to have sex. Romero decided to come clean about the robbery when she learned that the victim had given her cellphone number to the police. Lastly, Romero testified that Angelle was the father of her child.

Angelle also testified that he and Romero were living together at the time of the offense. They received a phone call from Malbrough who wanted to "hit a lick," meaning he was broke and wanted money. Angelle and Romero then met up with Malbrough and Defendant at a Shell station. Angelle knew Defendant by "Trill," his rapper name. Angelle did not know Defendant's real name. While at the gas station, they hatched a plan to rob the victim. Romero would remove the keys from the victim's car and the three men would confront and rob him. Angelle stated that the use of weapons was not part of the plan.

4

When they arrived at the location, Angelle, Malbrough, and Defendant hid while Romero waited in the street for the victim. When the victim drove up, Romero walked to his vehicle and removed the keys. Next, Malbrough and Defendant ran from behind a tree wearing black hoodies and bandanas covering their noses and mouths, and carrying guns. Malbrough and Defendant pointed their guns in the victim's face and yelled "Give it up." Meanwhile, Angelle searched the vehicle. The victim gave the men $289.00 and a few Ecstasy pills. They left the scene and went to Mennifer's house, where they split the money and pills. Angelle identified Defendant and Malbrough in open court as the two masked men who participated in the robbery.

Afterward, Angelle and Romero went back to his house and went to sleep. About an hour later, the police arrived. Angelle told the police that he had been sleeping since 8:30 p.m. and knew nothing about the offense. The police brought him and Romero to the police station. Once he arrived at the station, Angelle decided to cooperate and gave a written statement admitting to participation in the robbery. Angelle was charged with being a principal to armed robbery and pled guilty to the lesser charge of simple robbery. At the time of trial, Angelle had not yet been sentenced.

The victim, Nicholas Carter, testified that on the evening of December 15, 2008, Romero called him to meet her. When he arrived at the designated location, Romero removed the keys from his ignition, and two or three people wearing ski masks came out with guns. Angelle was present but was not wearing a mask and did not have a gun. The victim did not know the two men with guns. According to the victim, the men only took cash and were not looking for drugs. After they took his money, they returned his keys, and then fled the scene.

5

Less than a year after the offense the victim gave a second statement to an investigator, Roy Given, who was hired by Defendant's counsel. The following colloquy took place:

RG: In your own words, could you explain to me what happened

NC: Courtney Romero called me for a ride. I went to pick her up she pulled my keys out my ignition and two men came up with guns and demanded money on the corner of Arthur and St. Antoine

RG: How much money did they take

. . . .

NC: Okay. Was any of the ….. name the men that were involved

NC: Dryefus, Lorenzo but Lorenzo didn't have a gun and I couldn't see the other man but he was bigger

RG: Was any of these men Terrance Sinegal

NC: No

RG: Can you explain ….. give me a physical description of each one of these men that held you up

NC: All I know is …. one had on no mask and I couldn't see that was Lorenzo and the other had on a mask and he had dreads and the other one had on a mask but he was bigger, he was big

RG: You are positive that none of them was Terrance

NC: Yeah, positive

RG: Is there anything else you would like to add

NC: No sir

During the victim's incarceration for an unrelated offense, he was told that Malbrough, a prisoner in the same facility, wanted to talk to him. The victim was presented with a handwritten statement, indicating that he wanted to dismiss the charges against Malbrough. The statement, which the victim presumed was handwritten by Malbrough and dated March 6, 2011, read:

6

I Nick Carter on the above date and time chose not to pursue the charges of armed robbery on Mr. Dryefus Malborough [sic]. I Nick Carter was neither forced nor threatened to write this affidavit. The altercation between Mr. Malborough [sic] and I Nick Carter was just a misunderstanding and I Nick Carter again do not wish to pursue the charges on Mr. Malborough [sic]. Thank you for all of your help and concerns.

The victim signed the statement, his third statement regarding the offense. The victim denied being threatened by Malbrough to sign the statement. The victim did not know Malbrough or Defendant prior to the offense. Lastly, the victim testified that he was on probation at the time of trial as the result of pleading guilty to attempted possession with intent to distribute cocaine.

On cross-examination, the victim maintained that drugs were not taken from him during the robbery, and he was not in possession of drugs at the time of the offense. When asked if he had ever provided drugs to Romero, the victim stated he had smoked with her. He denied ever giving Romero Ecstasy pills. After the robbery, the victim followed the last vehicle to leave the scene. According to the victim, there were two or three cars at the scene, and he was only able to follow one.

The reason the victim gave his second statement on November 10, 2009, was to prove that the physical description of the perpetrator believed to be Defendant did not fit Defendant's physical description. According to the victim, the perpetrator was big. Additionally, the victim recalled telling the prosecutor on October 26, 2010, that Defendant had nothing to do with the offense. Again, the victim asserted that no one had threatened him.

On redirect examination, the victim admitted that about a year after the offense, he spoke with Defendant's mother, who asked the victim to help her. The victim then went to his attorney, who subsequently sent a private investigator to take the victim's statement. The victim denied implicating Malbrough in his

7

statement, because he did not know Malbrough at the time. The victim was then shown his statement wherein he identified Malbrough by name as a participant in the offense. The victim maintained that he could not see the men's faces but learned that Malbrough was there and had put a gun in his face.

Regarding his third statement, the victim stated he was taken from "the yard" to Malbrough's pod, where Malbrough gave the victim a document to sign. The victim testified that the document had already been written when it was given to him to sign, and he did not come up with the language in the statement.

Deputy Deidrick Beau Joseph, with the Lafayette Parish Correctional Center, testified that he was present when the victim signed the statement given to him by Malbrough. Malbrough was also present, and both Malbrough and the victim signed the document. According to Deputy Joseph, Malbrough asked him for a "huge favor," and asked him to bring the victim to him to sign a document. Deputy Joseph did not observe Malbrough using any intimidation toward the victim to get him to sign the document.

Officer Monika Porter, with the Lafayette Police Department, testified that on December 15, 2008, she was dispatched to a robbery in progress involving a weapon. The victim was following a vehicle driven by a possible suspect. Officer Porter conducted a traffic stop of the vehicle, and the occupants of the vehicle were detained. After speaking to one of the occupants, Kevin Prejean, Officer Porter learned that he was actually a witness to the offense. Prejean was released after his statement was taken. Officer Porter then spoke with the victim, who identified Angelle and Romero as two of the perpetrators. The victim gave a description of their clothing and of the vehicle driven by Angelle. The victim was acquainted with Angelle from high school. The victim explained to Officer Porter that he had gone to the location to pick up Romero. Romero opened the passenger door and

distracted him by placing something on the seat. Two masked men approached the driver's side of his vehicle and demanded money and pills. The victim was unable to identify the other two perpetrators, because they were wearing black hoodies and bandanas across their faces.

Officer Porter proceeded to Angelle's residence to question him. Angelle's clothing and vehicle matched the descriptions given by the victim. At that time, Officer Porter believed the victim was telling the truth. When Angelle failed to give an accurate account of his whereabouts that evening, Officer Porter *Mirandized* him and placed him in her unit. When Angelle was asked about Romero's whereabouts, he indicated that she was still in the residence. Romero was located in a bedroom, *Mirandized*, and placed in a separate unit. Her clothing also matched the description provided by the victim.

Angelle and Romero were transported to the police station, where they gave statements admitting to their participation in the robbery. According to Officer Porter, Angelle and Romero were not cooperative at first, but, after learning that the police had descriptions of their clothing and that the victim knew Angelle, they became very cooperative. Angelle and Romero identified two other suspects, Dryefus Malbrough and "Trill" as the two men with guns who were wearing hoodies and masks. In her statement, Romero advised that Malbrough needed some money or needed to "jack" someone for money. Romero then contacted the victim and told him she wanted some Ecstasy pills. The victim indicated he would meet her and give her pills at a designated location.

On cross-examination, Officer Porter testified that the victim did not advise her that he was meeting with Romero to sell her drugs. The victim maintained that he was only picking her up from the designated location. Officer Porter did not search for guns nor had she seen any evidence of guns.

9

Kevin Prejean testified that he witnessed the robbery in progress as he was driving by. He saw a tan truck with both doors open, a man with his hands up, another person near the truck wearing a mask, and two other people slowly taking off. Prejean also observed Angelle standing in the middle of the street about fifteen feet away from the truck wearing a muscle shirt. The perpetrators left the scene in a black car and a white four-door car with no hubcaps. The driver of the truck then started following Prejean until he was stopped by police, searched, and released after giving a statement.

On cross-examination, Prejean testified that more than one person was wearing a mask. Also, Angelle was not wearing a mask.

Officer Glenn Landry, with the Lafayette Police Department, testified that when he was assigned to the case, Angelle and Romero had already been arrested. Angelle reported that he was involved in the robbery along with two men, "Trill" and Dryefus Malbrough, also known as "Face." Angelle did not know Trill's actual name. However, Officer Landry learned from Angelle's mother that "Trill's" real name was Terrance Sinegal, the Defendant. Officer Landry ran the two men's names through the Application Data Systems and generated a photo lineup for each suspect. The photo lineups were presented to Romero, who identified both Defendant and Malbrough from their respective lineups.

Additionally, Officer Landry learned that two vehicles were used in the robbery, a white Chevrolet and a black Buick. The black Buick was reportedly owned by Angelle and was located at his residence. The white Chevrolet was located at Bruce's Auto Sales and had been rented by Mennifer Sinegal, Malbrough's girlfriend. The vehicle was returned right after the robbery.

Following his arrest, Malbrough refused to give a written or recorded statement. Malbrough did state to Officer Landry, however, that he had received a

10

text message from Angelle, who wanted to rob the victim of one hundred thirty-two ecstasy pills. He then met up with Angelle where the robbery occurred.

According to Officer Landry, Romero was very cooperative and explained what had occurred in the presence of her mother. She reported that she had received a call from Malbrough, who stated he wanted to "do a lick," or rob someone. She met Malbrough at a gas station and was instructed to call the victim and order pills. Romero called the victim and asked him to meet her. When the victim arrived at the designated location, Romero opened the passenger door. When the victim got out of his vehicle to retrieve pills hidden underneath or behind his seat, Romero reached inside and turned the vehicle off. Angelle, Malbrough, and Defendant approached the victim's vehicle. Malbrough and Defendant were wearing hoodies and bandanas and brandishing guns. The men took the victim's money, and he threw the pills down on the ground. The men got into their respective vehicles and left the scene.

Officer Landry compared the victim's statement with those of Angelle and Romero and found them to be consistent. The only inconsistency was the fact that the victim, a known drug dealer, never mentioned anything about Ecstasy pills. According to all three statements, the men with the guns were Defendant and Malbrough.

The evidence adduced at trial was sufficient to show that Defendant was one of the masked perpetrators involved in the robbery. Defendant was identified by Romero and Angelle, both participants in the robbery. Although Romero had not met Defendant and did not know his name prior to the offense, she identified Defendant in open court as "Trill," a participant in the robbery. Angelle knew Defendant by "Trill" and also identified him in open court as one of the masked participants in the offense.

11

On appeal, Defendant stressed that Romero and Angelle's identification of Defendant as a co-defendant is unreliable, citing *State v. Johnson*, 99-3462 (La. 11/3/00), 774 So.2d 79. In *Johnson*, the court, addressing the credibility of a witness, stated:

> [T]he custodial statements of a co-defendant identifying and implicating the defendant in the crime are presumptively unreliable as substantive evidence against the defendant. *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986) (" 'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." ') (quoting *Bruton v. United States*, 391 U.S. 123, 141, 88 S.Ct. 1620, 1631, 20 L.Ed.2d 476 (1968) (White J., dissenting).

*Id.* at 81. In the instant case, however, Angelle and Romero did not implicate Defendant to exonerate themselves. Prior to trial, Angelle plead guilty to simple robbery and was awaiting sentencing. Likewise, Romero admitted to her involvement as a principal to the robbery, served her sentence as a juvenile, and completed the drug court program.

Moreover, the jury could have easily found that the victim, a known drug dealer who was serving time for attempted distribution, was not credible. Additionally, the victim's second and third statements have little to no credibility. The victim admitted at trial that Defendant's mother contacted him prior to his second statement taken by defense counsel, not a police investigator, and asked the victim to help her. The jury could have reasonably concluded that the victim's second statement, negating Defendant's identification as a perpetrator, was not credible. Likewise, the circumstances surrounding and involving the victim's third statement which was prompted by co-defendant Malbrough are highly questionable, affording no credibility to the statement.

It is well settled: "As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state

12

is required to negate any reasonable probability of misidentification. However, positive identification by only one witness is sufficient to support a conviction." *State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002) (citations omitted). The State negated any reasonable probability of misidentifying Defendant as one of the masked perpetrators of the instant robbery; thus, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues that defense counsel erred in failing to object to the jury instructions, as they failed to instruct the jury to treat the testimony of the two co-defendants with great caution, and the trial court failed to instruct the jury as to the State's burden of proof when the defense raised the issue of misidentification.

In *State v. Christien*, 09-890, p. 7 (La.App. 3 Cir. 2/3/10), 29 So.3d 696, 701, this court stated:

> A claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief because this allows the trial court to order a full evidentiary hearing on the matter. *State v. Burkhalter*, 428 So.2d 449 (La.1983). However, where the record contains sufficient evidence to decide the issue, and the issue is raised by an assignment of error on appeal, it may be considered by the appellate court. *State v. Tapp*, 08-1262 (La.App. 3 Cir. 4/1/09), 8 So.3d 804; *See also State v. James*, 95-962 (La.App. 3 Cir. 2/14/96), 670 So.2d 461.

The record before this court is sufficient to determine whether defense counsel's performance was ineffective because he did not object to the jury instructions.

In considering a claim of ineffective assistance of counsel, in *State v. James*, 95-962, pp. 4-5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465, this court stated:

> The right of a defendant in a criminal proceeding to the effective assistance of counsel is constitutionally mandated by the Sixth Amendment of the U.S. Constitution. In order to prove that counsel was ineffective, the defendant must meet the two-pronged test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial.

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that his defense attorney failed to meet the level of competency normally demanded of attorneys in criminal cases. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Fickes*, 497 So.2d 392 (La.App. 3 Cir.1986), *writ denied*, 515 So.2d 1105 (La.1987).

In considering allegations of ineffectiveness, defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance. The United States Supreme Court has held that the benchmark for judging a charge of ineffectiveness is whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be considered to have produced a just result. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.

It is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a *specific showing of prejudice*. *State v. Brogan*, 453 So.2d 325 (La.App. 3 Cir.), *writ denied*, 457 So.2d 1200 (La.1984). A claim of ineffective assistance of counsel may be disposed of based upon a failure to satisfy either criteria of the established two-pronged test; if the accused's claim fails to satisfy one, the reviewing court need not address the other. *State v. James*, 555 So.2d 519 (La.App. 4 Cir.1989), *writ denied*, 559 So.2d 1374 (La.1990). A brief review of the defendant's complaints against his attorneys will demonstrate the deficiency of his arguments.

Here, the trial court instructed the jury that "[t]he testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal, that the witness is prejudiced, or that the witness has any other reason or motive for not telling the truth." Defendant maintains that the trial court should have instructed the jury to look upon the testimony of the two co-defendants with great caution. In support of his contention, Defendant refers to *State v. Hughes*, 05-992, p. 6 (La. 11/29/06), 943 So.2d 1047, 1051, *cert. denied*, 549 U.S. 1353, 127 S.Ct. 2065 (2007) (citation omitted), in which the court stated that "a conviction may be sustained on the uncorroborated testimony of a purported accomplice, although the jury should be

14

instructed to treat the testimony with great caution." The facts in *Hughes*, however, are clearly distinguishable from those in the instant case. The defendant in *Hughes* was charged with first degree murder and had been identified by co-defendants as the shooter to prove they had not committed the offense. The co-defendants herein, Angelle and Romero, admitted guilt and did not identify Defendant as a co-defendant to prove their innocence. We find that a warning to the jury as described in *Hughes* was not necessary. Additionally, in the instant case, there was no evidence introduced at trial to suggest that the State offered inducements to Angelle and Romero to testify against Defendant. Defendant has not shown that the co-defendants had anything to gain from identifying him as one of the perpetrators.

Defendant also asserts that the trial court did not address in its jury instructions the State's extra burden of proof when misidentification is raised by the defense. Defendant maintains that the victim's statements and testimony that the robber was bigger than Defendant and that Defendant was not one of the robbers was proof of a reasonable probability of misidentification.

There was no reasonable probability of misidentification of Defendant. Both Romero and Angelle testified about Defendant's involvement in the offense. They met Defendant prior to the offense, planned the commission of the offense, observed Defendant's participation in the commission of the offense, and met with Defendant after the offense to divide the cash taken from the victim. Although Romero and Angelle were not acquainted with Defendant prior to the offense, there is no indication in the record that either Romero or Angelle had any doubt regarding Defendant's identity as one of the perpetrators.

15

**ASSIGNMENT OF ERROR NUMBER THREE**

Defendant asserts that the trial court, on its own and without affording either side the opportunity to rehabilitate the prospective jurors, dismissed several jurors because of prior criminal acts committed against them or a family member. Defendant complains that, in contrast, the trial court denied challenges for cause raised by the defense against two prospective jurors, Mary Bundrick and David Travasos, who had prior robberies committed against them. Defendant also criticizes the trial court's denial of a challenge for cause against prospective juror Arlene Warnke, who discussed how she was worried about her son, who was at risk of being robbed due to his job. Defendant contends that the trial court's failure to grant these challenges for cause deprived him of his constitutional right to a fair and impartial jury.

In *State v. Juniors*, 03-2425, pp. 7-8 (La. 6/29/05), 915 So.2d 291, 304-05, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006), the court stated:

> Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of peremptory challenges granted a defendant in a capital case is fixed by law at twelve. LSA-C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory challenges, an erroneous ruling of a trial court on a challenge for cause that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. *See State v. Cross*, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; *State v. Bourque*, 622 So.2d 198, 225 (La.1993), *overruled on other grounds by State v. Comeaux*, 93-2729 (La.7/1/97), 699 So.2d 16. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and a defendant has exhausted his peremptory challenges. *State v. Robertson*, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280; *State v. Ross*, 623 So.2d 643, 644 (La.1993). Therefore, to establish reversible error warranting reversal of a conviction and sentence, defendant need only demonstrate (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. *Cross*, 93-1189 at 6, 658 So.2d at 686; *Bourque*, 622 So.2d at 225.

In reviewing challenges for cause, in *State v. Campbell*, 06-286, p. 73 (La. 5/21/08), 983 So.2d 810, 858, *cert. denied*, 555 U.S. 1040, 129 S.Ct. 607 (2008) (citations omitted), the court stated:

> [A] trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Even so, this court has cautioned that a venireman's responses cannot be considered in isolation and that a challenge should be granted, "even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably [inferred]." Yet a refusal to disqualify a venireman on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence.

Defendant and co-defendant in the instant case were tried for armed robbery, an offense necessarily punishable by imprisonment at hard labor. As such, both defendants had twelve peremptory challenges. La.R.S. 14:64; La.Code Crim.P. art. 799. The record reflects that each defendant exhausted his peremptory challenges. Also, after the jury was sworn in and dismissed for the day, Defendant's counsel moved to join in the challenges for cause made by co-defendant Malbrough.

Louisiana Code of Criminal Procedure Article 797 provides, in pertinent part, that the State or Defendant may challenge a juror for cause on the ground that:

> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
>
> . . . .
>
> (4) The juror will not accept the law as given to him by the court[.]

17

**Arlene Warnke**

Arlene Warnke was in the first panel of prospective jurors. Warnke stated that she was sixty-two years old and had some college education but no degree. Her adult son worked as a manager at a local restaurant.

After informing the potential jurors that Defendant was presumed to be innocent until proven guilty and could not be convicted unless the State proved each element of the offense charged against him beyond a reasonable doubt, the trial court asked the potential jurors if they could accept the law. Warnke raised her hand and stated:

> I'm sitting here listening thinking about armed robbery. And the only thing that concerns me is I have son who works at a restaurant who closes up as a manager. We talk about this all the time, about his safety, being alone, him going to the bank, being there by himself at night. I don't know if I can do this.

The trial court responded:

> Well, I mean, everybody has concerns, ma'am. Nobody wants to be a victim of a crime. You know, nobody—certainly you don't want your children or your kids to be a victim of a crime. That's a legitimate concern. But if the State doesn't prove their case, you're not going to – would you find the defendant guilty if the State doesn't prove it?

Warnke responded, "No." The trial court stressed that jurors must be fair to both sides and asked her if she could listen to the facts and apply the law. She responded affirmatively. The trial court acknowledged Ms. Warnke's concern about the safety of her son and asked her again if she could listen to the facts and apply the law. She responded, "I think so."

During the State's questioning of the panel, it stressed that if selected as a juror, it was the juror's job to determine who was being credible and trustworthy and what was good and bad. The State asked Warnke if she could perform the job and if she could listen to the testimony, give it the appropriate weight and

credibility, and make a decision based on what she heard from the stand. The transcript does not reflect that Warnke verbally answered the questions. Later, the State asked the panel if it met its burden of proof, would the potential jurors be able to find the defendants guilty as charged. Warnke responded, "Yes."

Next, Malbrough's counsel questioned the panel, discussing first the reasonable doubt standard. He then asked the potential jurors if they had a reasonable doubt, could they return a verdict of not guilty. Addressing Warnke, defense counsel confirmed she had a son in the restaurant business and that she was concerned about the possibility of armed robbery. Warnke indicated that her son thought about it often and fretted over the possibility. Warnke was then asked if this fact diminished her ability to protect Malbrough's rights and give him a fair trial. She responded, "I can't say a hundred percent that it wouldn't," and, "I'm saying that if it touched my heart, that may come to my mind, my son's situation."

Malbrough's counsel challenged Warnke for cause due to her concern about the threat of armed robbery of her son. Before a ruling was rendered by the trial court, the State moved for a reverse *Batson* challenge. The trial court responded, "Noted and denied." Malbrough's counsel subsequently used a peremptory challenge to excuse Warnke.

We find that Warnke's responses as a whole do not reveal facts from which bias, prejudice, or an inability to render judgment can be reasonably implied. She expressed her concern about the possibility that her son may be robbed in the future and clarified that such fear may come to mind if she was called upon to render a fair decision on the co-defendants' behalf. Warnke never stated or alluded to the possibility that the fear for her son's safety would prevent her from being fair or from accepting the law as given to her by the trial court. Accordingly,

19

Defendant has not shown that the trial court abused its discretion in denying this challenge for cause.

**Mary Bundrick**

Mary Bundrick, a prospective juror in the second jury panel, stated that she was fifty-eight years old and had a twelfth-grade education. Bundrick and her husband owned several businesses, including a truck stop, a construction dump, and a scrap yard.

During the trial court's questioning of the panel, the prospective jurors were asked if they or a close friend or relative had been a victim of a crime. Bundrick, amongst several other prospective jurors, raised her hand. Bundrick stated she previously owned two convenience stores that had been robbed. Also, her son was held at gunpoint at a restaurant where he worked, and her mother's home had been broken into. Given these facts, the trial court asked if she could be fair to both sides. Bundrick responded that she thought she could be fair but not with one hundred percent certainty. She said she would give it her best shot.

The trial court responded:

Look, listen, I'm not here, you know, trying to pull a genie out of the bottle. You know, your life experiences are your life experiences. And that's just the way it is. But what I need to know, though, is that you won't hold that, your life experiences or the ill that you may have suffered against these defendants or against the State. That's all I'm asking you. Do you understand? I mean, I don't go to bed – I've got an alarm in my house, and I make sure the alarm is on every night. That's an apprehension because I don't want nobody to break in on me.

Bundrick assured the trial court she was going "to keep an open mind." The trial court then stated:

THE COURT:

That's all I'm asking. I just – you know, keep an open mind to both sides. And if I decide if the State doesn't meet their burden, will you hold the State's feet to the fire.

MR. GRAND (#190):

I think what we're trying to say is defensive – we're more aggressive now, defensive to protect ourselves than when we –

THE COURT:

I understand that Mr. Grand. I understand that. Mr. Grand, that is perfectly normal. I understand that. That is absolutely perfectly normal. I just don't want you to walk in there with the premonition that because of your experience that I'm going to punish either the State or the defense. You understand? For example, if you've got a relative that was convicted of a crime and sent to the penitentiary, and you're sitting on a jury, you wouldn't hold that against the State, would you? You understand what I'm trying to get at.

MS. BUNDRICK (#82):

Yes.

A short time later, all of the prospective jurors remaining on the panel confirmed that they would follow the law as instructed by the trial court. Counsel for the State asked the prospective jurors if they could find the defendants guilty if they were proven guilty. Bundrick responded affirmatively. Malbrough's counsel asked Bundrick if she would be able to protect Malbrough's right to be free from false imprisonment by evidence that was not believable or credible; she responded affirmatively.

Malbrough's counsel challenged Bundrick for cause on the basis that she had two stores, with at least two robberies at one of the stores. Also, her son was held at gunpoint, and her mother had a home invasion. The challenge was denied. Defendant, not Malbrough, subsequently used a peremptory challenge to excuse Ms. Bundrick.

Although Bundrick indicated she was not one hundred percent certain she could be fair based on her past experiences as a victim and those of her family, she said that she would give it her best shot. After the trial court explained that neither

21

the State nor the defendants should be punished based on any of the jurors' past experiences, Bundrick expressed that she understood and later indicated that she would be able to protect Malbrough's right to be free from false imprisonment by evidence that was not believable or credible. Considering Bundrick's responses as a whole, there are no facts from which bias, prejudice, or an inability to render a judgment according to the law can be reasonably implied; thus, Defendant has not shown that the trial court abused its discretion in denying this challenge for cause.

**David Travasos**

David Travasos, a prospective juror in the third jury panel, stated that he was thirty-eight years old, he had a twelfth-grade education, and he worked as a residential general contractor.

During the trial court's questioning of the panel, the prospective jurors were asked if they or a close friend or relative had been a victim of a crime, and Travasos, amongst several other prospective jurors, raised his hand. Travasos stated that three thefts occurred at his personal residence, two involving his car and one involving his garage. Also, three years prior to trial, his home was burglarized. Lastly, he and his wife were held up at a bar and were later involved in the prosecution of the perpetrator. They went to court several times but were not satisfied with the outcome. The trial court asked Travasos if he could be fair to the defendants. Travasos replied, "Yes. I think so." The prospective jurors were then asked if they could hold the State to the burden of proving the defendants' guilt beyond a reasonable doubt. They answered affirmatively.

Counsel for the State asked the panel members if they could find the defendants guilty if the elements of the offense were proven, and Travasos responded affirmatively. Defendant's counsel confirmed that Travasos was a

victim of an armed robbery and was disappointed in how the matter was handled and in the outcome.  The following colloquy ensued:

MR. NEUMANN:

Does that disappointment in any way affect your -- the burden that you put on the State as far as bringing the case?

MR. TRAVASOS (#154):

No.  I don't believe it will.  I don't believe it will.  I have nothing against these guys right here.  Am I going to say, when I'm hearing some of this, I ain't going to remember being locked in a cooler, probably I will, but as I stand right now before -- pre-trial, I'd say no.

. . . .

MR. NEUMANN:

If the evidence that's presented, testimony, that there was a gun used, part of Mr. Prather's burden is to show that there was a gun used --

MR. TRAVASOS (#154):

Right.

MR. NEUMANN:

-- armed robbery.  Is that going to cause you to be less impartial?

MR. TRAVASOS (#154):

I don't believe.

MR. NEUMANN:

Your personal experience.  I think y'all were here when we spoke to Mr. Kennon.  He didn't want to be a juror on his own jury because of his personal experience.

MR. TRAVASOS (#154):

I don't know.  I mean, I wouldn't want to be up here, but you know, who knows.  Maybe this will be a turning point for me.  Maybe I'll see how things really are.

MR. NEUMANN:

23

Maybe so. Maybe so. Your personal experience, you can put that aside and you can sit here fair and impartial?

MR. TRAVASOS (#154):

I think I can. I think I can.

Malbrough's counsel challenged Travasos for cause, and the challenge was denied. Travasos was accepted as a juror.

Although Travasos was the victim of an armed robbery and was affected by same, he believed, nonetheless, that he could be fair and impartial to the defendants. His responses as a whole do not reveal facts from which bias, prejudice, or an inability to render a judgment according to the law can be reasonably implied. Further, Travasos demonstrated a willingness and ability to decide the case fairly according to the law and evidence. Accordingly, Defendant has not shown that the trial court abused its discretion in denying this challenge for cause.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

Defendant argues that the trial court erred in denying his right to call witnesses on his behalf, thereby depriving him of the opportunity to present a defense to counter the State's accusation.

Prior to bringing in the potential jurors, the trial court stated:

THE COURT:

Oh, wait, wait, one other thing. I understand there's [sic] been some issues on both sides of the aisle with witnesses. Let me tell you if anybody complains to me that they were intimidated by anyone, I'm going to lock you up immediately without bond. So if you seek out a witness and that witness feels that they were intimidated, I'm going to lock you up. Now if anybody don't [sic] understand that. Okay. . . .

24

Following a brief discussion regarding the procedure the trial court intended to use for jury selection and possible contamination of the jury, the trial court stated:

THE COURT:

All right. What are all those people, though, sitting on that side?

BAILIFF:

(Inaudible)

THE COURT:

They're what?

BAILIFF:

Family.

THE COURT:

Are they victims? All of you are victims?

MR. PRATHER:

Witnesses.

THE COURT:

And witnesses on this side. Okay.

The trial court then called for the first sixty-five prospective jurors, and the following colloquy took place:

THE COURT:

All right. Gentlemen, are we ready?

MR. PRATHER:

Yes, Judge. I'm ready.

MADAME CLERK:

Number forty-six (46), Helen Bobinox.

25

THE COURT:

Helen Bobinox.

MR. PRATHER:

Well, let's address this one, Judge.

THE COURT:

Hold on a second.  Hold on.

[SIDEBAR CONFERENCE]

THE COURT:

All right.  Mr. Neumann, who do you represent?

MR. NEUMANN:

I represent Terrance Sinegal.

THE COURT:

All right..  I understand -- we just had a sidebar conference. You indicated that Mr. Sinegal just now gave you a list of the witnesses --

MR. NEUMANN:

Gave me names of six (6) witnesses.  In questioning him as far as who he would want to come testify as far as, you know, providing character witnesses and things of that nature, I asked him I knew that we would be answering questions of --providing names to the jury as far as who may testify.  He gave me these six (6) names.  Some of these individuals --I've met with one or two of them who are family members during the last two days, but I don't know what all of them are going to testify to.

THE COURT:

Well, was that information failure to get a copy - -

MR. NEUMANN:
Now it is.

THE COURT:

Just now?

MR. NEUMANN:

26

Just now.

THE COURT:

Wow, I don't think that's playing by the rules.

If you didn't give them to the DA, I'll not allow it. I'll note your objection for the record.

MR. NEUMAN:

Thank you, Your Honor.

Defendant asserts on appeal that he is uncertain what other discussions were held during the sidebar conference regarding the identity of the witnesses and what would be presented via their testimony. In a footnote, Defendant adds:

> It is believed that these witnesses would have presented alibi testimony as well as information from the mother of Appellant concerning her contact with the victim's family. This testimony was essential to refute the State's case and the hypothesis suggested by the State.

The sidebar conference was not transcribed.

In support of his argument, Defendant refers to La.Code Crim.P. art. 727, regarding notice of alibi, which reads:

> A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

> B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

C. If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under Subsection A or B, the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

D. Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.

E. For good cause shown, the court may grant an exception to any of the requirements of Subsections A through D of this Section.

F. Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention.

Defendant contends that the record contains no written demand as required by Article 727 nor any discovery motions. Defendant maintains that he was not required to disclose the identity of the witnesses prior to trial, and the trial court should not have excluded their testimony.

The record reflects that the names of the six witnesses were provided to Defendant's counsel. Defendant indicated to his counsel that the persons identified would provide testimony as to Defendant's character and "things of that nature." Given the opportunity, defense counsel simply did not state that the witnesses identified at that moment were alibi witnesses for purpose and application of Article 727. Therefore, Article 727 does not apply to the instant situation.

We note, however, that La.Code Crim.P. art. 728 "does not authorize the discovery . . . of the names of defense witnesses or prospective defense witnesses." Thus, Defendant was not required to disclose the identity of these witnesses; the trial court erred in excluding their testimony.

28

"Trial error is harmless where the verdict rendered is 'surely unatttributable to the error.' *State v. Johnson*, *supra* [94-1379 (La. 11/27/95), 664 So.2d 94]." *State v. Knight*, 45,231, p. 13 (La.App. 2 Cir. 5/19/10), 36 So.3d 1163, 1172, *writ denied*, 10-1425 (La. 1/14/11), 52 So.3d 899. Louisiana Code of Evidence Article 404 provides, in pertinent part:

> **A. Character evidence generally.** Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> **(1) Character of accused.** Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.

Accordingly, the testimony of any of the six witnesses regarding Defendant's character would have been significantly restricted, if allowed at all. Considering the evidence of Defendant's guilt presented by the State at trial, we find that any possible error in excluding this alleged character evidence was harmless; thus, there is no merit in this assignment of error.

## ASSIGNMENT OF ERROR NUMBER FIVE

Defendant argues that the trial court erred in failing to assure that discussions and arguments of counsel made during sidebar discussions were recorded and preserved for appellate review, thereby denying his right to an appeal. Defendant contends that the trial court did not summarize the bench conferences for the record and complains that the comments on the record do not make it easy to discern the content of the bench conferences. Defendant also maintains that the bench conferences affect the consideration of the argument in his brief regarding whether he exhausted all of his peremptory challenges and whether the trial court erred in denying his right to call witnesses on his behalf.

In support of his argument, Defendant refers to *State v. Pinion*, 06-2346 (La. 10/26/07), 968 So.2d 131. The defendant in *Pinion* complained that he was deprived of his constitutional right to meaningful appellate review because the court reporter failed to adequately record bench conferences involving the challenges for cause and peremptory challenges made during a voir dire examination. On appeal, the first circuit rejected the defendant's claim, concluding that the defendant failed to show prejudice as a result of the missing portions of the transcript. The supreme court found that it was possible to reconstruct portions of what transpired during the bench conferences and determine with a reasonable degree of certainty that the defendant exhausted his peremptory challenges by the end of the third panel, positioning him to raise on appeal the trial court's denial of his challenges for cause he then struck peremptorily. In reaching its decision, the supreme court stated:

> Although it reached the wrong result in the present case, the court of appeal began with the correct premise. This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843, which requires in felony cases the recording not only of the evidentiary portions of trial but also of "the examination of prospective jurors . . . and objections, questions, statements, and arguments of counsel." *State v. Hoffman*, 98-3118, p. 50 (La.4/11/00), 768 So.2d 542, 586. The Court has instead conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal. As a general rule, the failure of the record to reflect the argument of counsel on objections, even when made in open court, does not affect a defendant's appeal because it does not hinder adequate review of the trial court's ruling. *State v. Johnson*, 438 So.2d 1091, 1104 (La.1983). Thus, the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant. *See, e.g.*, *Hoffman*, 98-3118 at 50-51, 768 So.2d at 587 (trial court cured any record problems "by summarizing substantive unrecorded conferences for the record"); *State v. Castleberry*, 98-1388, pp. 28-29 (La.4/13/99), 758 So.2d 749, 773 (three unrecorded bench conferences during direct examination of state witnesses had no discernible impact on the proceedings and the

30

fourth concerned a mistrial motion by defense counsel, the basis of which was "easily ascertainable from the record" without regard to the unrecorded side-bar discussion); *State v. Deruise*, 98-0541, pp. 9-15 (La.4/3/01), 802 So.2d 1224, 1233-37 (failure to record bench conferences in which the prosecutor and defense counsel made their peremptory and cause challenges did not prejudice the appeal when the jury strike sheet was available for review and detailed the exercise of peremptory challenges by both sides and when the transcript of the voir dire revealed a substantial basis for denying a defense cause to the juror, even assuming that the challenge had been made but not preserved in the record; remaining unrecorded bench conferences involved evidentiary matters that were otherwise addressed in the appeal, or involved matters of no discernible impact for which the defendant failed to demonstrate prejudice); *State v. Allen*, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722 (failure to record arguments at the bench concerning some of the defense peremptory challenges harmless when challenges for cause and arguments on the challenges were fully transcribed in the record and the minutes clearly reflected which jurors had been excused peremptorily and whether the state or defense had exercised the challenge).

On the other hand, in *State v. Landry*, 97-0499 (La.6/29/99), 751 So.2d 214, a combination of loud construction noise at the courthouse and audio recording problems on the part of the court reporter rendered the record grossly incomplete in several respects, including the failure to record peremptory strikes and challenges for cause made at the bench. *Landry*, 97-0499 at 1-2, 751 So.2d at 215. This Court reversed the defendant's capital conviction and sentence and remanded for a new trial because the deficiencies deprived the defendant of his constitutional right of appeal and judicial review. *Landry*, 97-0499 at 4, 751 So.2d at 216. The Court thereby reaffirmed that "it is not the defendant's obligation to insure an adequate record . . . . it is the duty of the court . . . . to see that the court reporter makes a true, complete and accurate record of the trial." *Landry*, 97-0499 at 3, 751 So.2d at 216 (citing *American Bar Association Standards Relating to the Function of the Trial Judge*, § 2.5 (1972)).

*Id.* at 134-35.

The record reveals that the transcription of the bench conferences was not necessary to determine whether Defendant exhausted all of his peremptory challenges; thus, there was no discernible impact on the proceedings regarding jury selection. Regarding the trial court's denial of his right to call witnesses on his behalf, the record reflects that the trial court summarized the conversation held off the record and then a discussion was held on the record regarding the trial court's

ruling. Defendant has not shown any discernible impact on the proceeding that resulted in specific prejudice.

## ASSIGNMENT OF ERROR NUMBER SIX

Defendant argues that the trial court failed to consider the factors in La.Code Crim.P. art. 894.1, and the maximum sentence imposed was excessive.

> Louisiana Code of Criminal Procedure Article 881.1(E) requires a defendant to set forth the specific grounds on which a motion to reconsider may be based. Failure to include a specific ground upon which a motion to reconsider sentence may be based "shall preclude . . . the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review." *Id.* In the present case, although the defendant generally raised the issue of excessiveness in his motion to reconsider sentence, he failed to specifically allege that the trial court failed to consider the factors of La.Code Crim.P. art. 894.1. Accordingly, because that claim was not specifically set forth in his motion to reconsider, it cannot be reviewed in this appeal, *State v. Landry*, 09-260 (La.App. 3 Cir. 11/4/09), 21 So.3d 1148, *writ denied*, 09-2577 (La.5/21/10), 36 So.3d 229, and our review of the defendant's sentence is restricted to his bare claim of excessiveness. *State v. Mims*, 619 So.2d 1059 (La.1993).

> The sentencing court has broad discretion in imposing penalties for criminal convictions:

>> A sentence which falls within the statutory limits may be excessive under certain circumstances. To constitute an excessive sentence, this Court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and therefore, is nothing more than the needless imposition of pain and suffering. The trial judge has broad discretion, and a reviewing court may not set sentences aside absent a manifest abuse of discretion.

> *State v. Guzman*, 99-1753, 99-1528, p. 15 (La.5/16/00), 769 So.2d 1158, 1167 (citations omitted). "The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331.

*State v. Prejean*, 10-480, pp. 2-3 (La.App. 3 Cir. 11/3/10), 50 So.3d 249, 251-52. The courts agree that maximum sentences are typically reserved for the most serious offenses and the most egregious offenders. *See State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682.

The penalty for simple robbery is not more than seven years imprisonment, with or without hard labor, or a fine of not more than $3,000.00, or both. La.R.S. 14:65. Defendant's sentence was the maximum possible sentence, but he was spared a fine.

At Defendant's sentencing on March 31, 2011, the trial court did not state for the record its reasons for the sentence imposed. The trial court stated:

> You are sentenced to serve 7 (seven) years hard labor with credit for time served. With no objection to IMPACT program or any doc programs that the defendant may qualify for.

Defendant did not file a motion to reconsider sentence, thus, we conduct a bare-bones review of his sentence. Although it is true that the trial court failed to state the considerations it took into account, we find Defendant greatly benefited from the responsive verdict of simple battery which reduced his sentencing exposure from ninety-nine years to seven years. Further, pursuant to a bare-bones review, we find the trial court did not abuse its discretion in sentencing defendant. When there is adequate factual support in the record for the sentence, remand is unnecessary even if the trial court has not strictly complied with La.Code Crim.P. art. 894.1. *State v. Lanclos*, 419 So.2d 475 (La. 1982). Defendant's sentence is not excessive. This assignment of error is without merit.

## DISPOSITION

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**